**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT COOKEVILLE**

| | | |
|---|---|---|
| **JENNIE ROBERTS,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **vs.** | § | **NO.      2:09-cv-00005** |
| | § | **Judge Trauger** |
| **DOLGENCORP, INC. and** | § | **Magistrate Judge Knowles** |
| **DOLGENCORP, LLC,** | § | |
| | § | |
| **DEFENDANTS.** | | |

**DEFENDANTS REPLY TO**
**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Defendants Dolgencorp, Inc. and Dolgencorp, LLC ("Defendants") file this Reply to

Plaintiff's Statement of Additional Facts and in support thereof, Defendants state:

**I.**
**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT FACTS ARE NON-**
**RESPONSIVE AND FAIL TO SHOW EVIDENCE THAT DEFENDANTS' FACTUAL**
**CONTENTIONS ARE ACTUALLY DISPUTED.**

Local Rule 56.01(c) requires that a response is required as to each fact contained within the

opposing party's Statement of Facts, setting forth the following:

(i) agreeing that the fact is undisputed;

(ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary
judgment only; or

(iii) demonstrating that the fact is disputed.

Each disputed fact must be supported by specific citation to the record.

L.R. 56.01(c). In Plaintiff's Response to Defendants' Statement of Facts, Plaintiff has entirely

failed to comply with the requirements set forth in the rule. Accordingly, the Court should deem

Defendants' Statement of Facts to be "undisputed." The vast majority of Plaintiff's "responses" to each

fact are vague, evasive and/or non-responsive.

For example, paragraph 3 of Defendants' Statement of Facts asserts that a Store Manager is

the highest level supervisory personnel and the only exempt, salaried employee in the store. In addition, Dollar General stores are ordinarily staffed with an Assistant Store Manager, Lead Clerk, and multiple store clerks. During the relevant time period when each Plaintiff was employed as a Store Manager for Dollar General, stores had an average of 7-8 employees, 4-5 of whom were clerks.

In response, Plaintiffs asserted an "objection" based on their assertion that the "district manager is part of the store team and has significant, if not sole authority, over certain store operations. Plaintiffs' further object that store managers are 'exempt' employees." In this response, Plaintiff's failed to directly agree or dispute whether store managers were the highest supervisory personnel in the store, the only salaried employee in the store, and did not even address the portions dealing with typical staffing and composition of a store's employees. The only portion directly addressed was whether store managers were "exempt"— which is the ultimate legal question of the litigation.

In paragraph 7 of Defendants' Statement of Facts, Defendants asserted that "Dollar General relies on the Store Manager in each location to implement and enforce the Company's policies and procedures." Again, and throughout Plaintiff's Response, Plaintiff fails to respond as required by the local rules and instead asserts, citing no particular evidence, that "Dollar General store managers are expected to apply well-established procedures within closely prescribed limits." Although Plaintiff "objects" to Defendants' statement in paragraph 7, the response sounds more like an agreement that the fact is undisputed.

In paragraph 10 of Defendants' Statement of Facts, Defendants assert that "Each Store Manager manages and directs employees, oversees all store operations, and is charged with ensuring that his or her store makes a profit." Plaintiff's non-responsive response, again citing no evidence, is to "object" and assert that the "most important job duty of a Dollar General store manager is performing non-managerial duties" and that "store managers have limited discretion and ability to perform managerial duties." Because the fact says nothing about what is the "most important duty" or the level of "discretion" Store Managers have, Plaintiffs have not addressed it, nor provided citation of evidence to the contrary.

Without cataloging each and every of Plaintiff's non-responsive responses (most of them), her Response to paragraph 15 of is indicative of most of them. Defendants' fact states there that "Store Managers are eligible for certain bonuses, such as annual 'Teamshare' bonuses. Store Managers were at

times also eligible for quarterly 'in stock' bonuses that paid $250 per quarter if certain in-stock goals were met." Rather than agreeing or citing some evidence to the contrary, Plaintiff elects to avoid responding at all by making inapplicable assertion (again, citing no evidence except for a reference to <u>Defendants'</u> <u>Statement of Facts</u>) that "The most important job duty of a Dollar General store manager is performing non-managerial duties, contrary to paragraph 15's implication. Furthermore, store managers have limited discretion and ability to perform managerial duties. Additionally, store managers were not the only employees eligible to receive bonuses."

And so it goes, on and on. The Court should not have to try and parse which of Defendants' facts it is that Plaintiff actually objects to and to which ones Plaintiff believes there is a legitimate dispute, based on some tangible evidence. Having provided Plaintiff this opportunity and in light of Plaintiff's failure to do so, the Court should deem Defendants' Statement of Facts as being undisputed.

## II.
## DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Plaintiff has asserted two sets of additional facts, one, with respect to facts purported to be common to all Plaintiffs; and two, with respect facts specific to Plaintiff Jennie Roberts. Defendants will respond to each set of additional facts in turn.

## A.    Plaintiff's "Common" Additional Facts and Defendants' Responses

1.      A survey conducted by Dollar General found that only 10% of total store time is spent on administrative duties. (Common Ex. 1, App. 38-39, Overview of Store Time.) The vast majority of store time is spent on stocking, receiving product, checking out customers, and cleaning. <u>Id.</u> Stocking, receiving product, checking out customers, and cleaning accounts on average for 85% of total store time. (Common Ex. 1, App. 38-39, Overview of Store Time.)

**RESPONSE:**  For the purposes of this summary judgment motion only, Defendants do not dispute the findings referenced in the survey—a survey that is not relevant to Plaintiff's claims.[1] The undisputed facts in this paragraph are not material, and are intended only to mislead the Court into

---

[1] *See* Defendant's Motion to Strike.

equating "store time" with a "Store Manager's time." The two are not the same, and there is no evidence of any survey of Store Managers' time, or more specifically, Store Managers' "administrative duties," and are not specific to Roberts.

2.      During the receiving process, the average Dollar General employee, including the store manager, walks 3-8 miles and carries 3-4 tons of merchandise. (Common Ex. 2, App. 40-41, Interesting Facts from Store Diagnostic.) Dollar General recognizes that "truck day" places a burden on store employees. Truck day is the central focus of a Dollar General store. Stores typically receive between 800 and 1200 boxes of merchandise each week that must be unloaded. Almost all employees must work truck day. Working truck day is a very physical job.

**RESPONSE:**   Defendants dispute the conclusions that "truck day is the central focus of a Dollar General store" and "truck day is a very physical job"—assertions that are vague, ambiguous, and which are supported by no admissible evidence.[2] For the remainder of the facts set forth above, and for purposes of this summary judgment motion only, Defendants do not dispute the facts. The disputed and undisputed facts in this paragraph are not material.

3.      The physical labor of a store manager is necessary to perform the duties listed on the store manager job description, including "[f]acilitate the efficient staging, stocking and storage of merchandise by following defined company work processes," "[e]nsure that all merchandise is presented according to established practices," and "[m]aintain a clean, well organized store, facilitate a safe and secure working and shopping environment." (Common Ex. 6, App. 98-100, Store Manager Job Description.) In addition, under the "Working Conditions and Physical Requirements" heading, it states "[f]requent bending, stooping and kneeling to run check out station, stock merchandise and unload trucks." Id. It also states "[f]requent and proper lifting of up to 40 pounds, occasional lifting of up to 55 pounds." (Common Ex. 6, App. 98-100, Store Manager Job Description.)

**RESPONSE:**   For the purposes of this summary judgment motion only, Defendants do not

_____

[2] *See* Defendant's Motion to Strike.

dispute these facts. The undisputed facts in this paragraph are not material, and are intended only to mislead the Court into equating the existence of physical job requirements with an unsupported presumption that the job requires only manual labor, or that Dollar General primarily values "manual labor" performed above other job duties and responsibilities.

4.       Store managers are provided with labor budgets which sets the number of employee hours they are to spend each week. Store managers have no control over the amount of labor hours given to the store they work in. The average labor budget provides about 150 labor hours per week. (Common Ex. 7, App. 101-102, Store Manager Survey Responses Common Questions.)

**RESPONSE:**  Defendants dispute the conclusion that "store managers have no control over the amount of labor hours," which is not supported by admissible evidence. In fact, it is undisputed that Store Manager's primary responsibility involves increasing sales and profitability, which in turn, partially drives labor budgets. Plaintiff Jennie Roberts also had control over the efficient scheduling and use of labor hours,[3] as well as the ability to request additional labor as circumstances require, and supervision of employees' work to ensure that labor hours were being used productively.[4] Although the assertions in this paragraph are disputed, they are not material facts.

5.       It takes an average of 14.61 employee labor hours just to receive a truck shipment. (Common Ex. 8, App. 103-104, Store Manager Survey Responses – Version A.) Sixty-six percent (66%) of store managers take at least two days to stock an entire truck shipment. (Common Ex. 9, App. 105-106, Store Manager Survey Responses – Version A.) Thirty-four percent (34%) of store managers take at least four days to stock an entire truck, (Common Ex. 9, App. 105-106, Store Manager Survey Responses – Version A), meaning it is almost time for another truck shipment before they are through stocking. It takes an average of 57.48 employee labor hours to stock an entire truck delivery. (Common Ex. 10, App. 107-108, Store Manager Survey Responses – Version A.) Unloading the delivery truck is the largest "pain point" for stores. Stocking "non-core" merchandise is the second largest "pain point" for stores. One

[3] Roberts 2010 Dep. 72:1-75:21.

[4] *See* SOF ¶ 61.

reason stocking "non core" merchandise is the second largest "pain point" for stores is because store managers feel as though they do not have enough time to complete the stocking. Stocking "core" merchandise is the most time-consuming activity that takes place in a store apart from checkout.

   **RESPONSE:** Defendants dispute the assertion that "store managers take at least two days to stock an entire truck shipment" to the extent that it implies that Store Managers do all (or even a majority) of the stocking. The evidence cited by Plaintiffs does not support this assertion; rather, the evidence cited states that the work is completed by a third of survey respondents' <u>stores</u> within two days.[5] For the purposes of this summary judgment motion only, Defendants do not dispute the findings set forth in this particular survey—one which is not relevant to Plaintiff's claims.[6] The undisputed facts in this paragraph are not material, and are intended only to mislead the Court into ascribing a specific meaning as to an undefined and context-less term, "pain point."

   6.  A survey conducted by Dollar General indicated that the majority of store managers found that the lack of hours was the most difficult part of doing the quarterly apparel guide. (Common Ex. 13, App. 113-114, Store Manager Survey Responses – Version C.) In addition, when asked "How can Dollar General make things better for customers," many store managers said that the stores should be given more employee hours to distribute. (Common Ex. 14, App. 115-120, Store Manager Survey Responses – Version A.) When asked "How can Dollar General make things better for our employees," many store managers said provide additional payroll hours so they could have additional help in the store. (Common Ex. 15, App. 121-125, Store Manager Survey Responses – Version A.) Two-thirds (2/3) of the stores cannot meet the company standard of getting all shipment stocked within 48 hours after delivery. (Common Ex. 16, App. 126-127, Interesting Facts from Store Diagnostic.) When surveyed, the large majority of store managers (70%) indicated that they never called in an additional employee due to higher than expected customer traffic. (Common Ex. 17, App. 128-129, Store Manager Survey Responses – Version B.) Another twenty-three percent (23%) only called an employee in due to higher than expected

---

[5] *See* Pltf's Common Ex. 9, App. 105-106, Store Manager Survey Responses – Version A

[6] *See* Defendant's Motion to Strike.

traffic once or twice a month. Id. Also, sixty-four percent (64%) of store managers surveyed were not following the company policy of "recovering" the store everyday, which is a systematic straightening of store merchandise. (Common Ex. 18, App. 130-131, Store Manager Survey Responses–Version B.) Of the sixty-four percent (64%) not "recovering" the store daily, seventy-nine percent (79%) of those store managers responded that lack of employee hours was the reason. (Common Ex. 19, App. 132-133, Store Manager Survey Responses – Version B.) Forty-three percent (43%) of store managers say that lack of hours is the most difficult part of doing the planogram for core merchandise. (Common Ex. 20, App. 134-135, Store Manager Survey Responses – Version C.)

      **RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute the findings set forth in this particular survey—one which is not relevant to Plaintiff's claims.[7] The undisputed assertions in this paragraph are not material facts, and the generalized survey information does not reflect any evidence specific to Plaintiff Jennie Roberts, who was not part of the survey in question.[8]

      7.     Store managers are only expected to work 45 hours per week. (Common Ex. 21, App. 140, Def.'s Resp. to Pls.' Interrog. 3.) Yet, the large majority of store managers work well in excess of 45 hours per week due to the restrictive labor budget they are provided. There is simply not enough employee hours allotted to the stores to perform many tasks and so the store manager is stuck performing the manual labor.

      **RESPONSE:** Defendants dispute the unsupported conclusions that "Store Managers are only expected to work 45 hours per week;" "the large majority of store managers work well in excess of 45 hours per week" and there "is simply not enough employee hours allotted to the stores to perform many tasks and so the store manager is stuck performing the manual labor;"— assertions which are not supported by evidence, either generally or specific to Roberts. Although disputed, these assertions are not material facts.

[7] *See* Defendant's Motion to Strike.

[8] *Id.*

8.     The placement of merchandise on the shelves is set by the "planogram," which is a map showing where store employees should place merchandise, and store managers have no discretion to deviate from the planogram. The average Dollar General store spends 89.4 labor hours per week doing the planogram for core merchandise. (Common Ex. 20, App. 134-135, Store Manager Survey Responses – Version C.) Forty-three percent (43%) of store managers surveyed indicated that lack of labor hours was the most difficult part of doing the planogram for core merchandise. Id. Dollar General provides stores with "shelf strips," most of which have pictures that show what item should be placed in a particular shelf space.

**RESPONSE:** Defendants dispute the unsupported conclusion that the "placement of merchandise on the shelves is set by the 'planogram' and … store managers have no discretion to deviate from the planogram"—a fact which is supported by no evidence. In contradiction, Roberts admits not only that she had discretion to plan her choice of merchandise in store's "flex space" and "manager's choice" area, but also that she used her discretion to teach other employees how to merchandise.[9] For the remainder of the facts set forth above, and for purposes of this summary judgment motion only, Defendants do not dispute the findings set forth in this particular survey—one which is not relevant to Plaintiff's claims.[10] The disputed and undisputed assertions in this paragraph are not material facts, and are intended only to divert the Court from Plaintiff's direct admissions.

9.     Inventory is replenished by Dollar General's Basic Stock Replenishment system, which orders items for a store automatically once inventory reaches a certain low level. Forty-seven percent (47%) of store managers do not feel as though they control the accuracy and effectiveness of the Basic Stock Replenishment system. (Common Ex. 2, App. 40-41, Interesting Facts from Store Diagnostic.) The merchandise allocation level for each store is determined by the corporate headquarters based on analysis of sales history and current inventory levels. District managers, but not store managers, are able to partner with regional managers and request that a store's allocation level be changed.

[9] Roberts 2010 Dep. 76:15-77:19.

[10] *See* Defendant's Motion to Strike.

**RESPONSE:** For purposes of this summary judgment motion only, Defendants do not dispute the findings of the Store Diagnostic cited. The undisputed assertions in this paragraph are not material facts.

10. Store managers have little control over what type of merchandise is sold in the stores. These decisions are made by Dollar General's corporate headquarters. Furthermore, store managers do not have the authority to decide the hours of operation of the stores. Any deviation from the store operating hours set by Dollar General must be approved.

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The undisputed facts in this paragraph are not material.

11. Store managers are required to follow a Dollar General manual referred to as "Standard Operating Procedures" ("SOPs"). The SOPs provide store managers with step-by-step instructions on how to perform job functions. These step-by-step instructions are so detailed that they have been compared to instructions on how to assemble a product.

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The undisputed assertions in this paragraph are not material facts, and are also misleading to the extent that they imply that Store Managers have no discretionary power to manage their stores or that SOPs are intended to tell a Store Manager how to handle every situation that might arise in a store. Plaintiff Jennie Roberts testified that she could use her best judgment to deviate from the SOPs when necessary or appropriate, and that the SOPs were nothing more than a "tool" or "reference" material in her job performance.[11]

12. District Managers are responsible for operating the stores. Dollar General documents indicate that it considers district managers to be part of the store teams. Dollar General expected district managers to be involved in the selection of floor care vendors. Store managers were forbidden from entering into contracts with service vendors. The district managers had to approve the key carrier responsibilities for the lead clerk. Before a store manager could use contract labor, they had to have

[11] *See* Ex. 37, APP 3335, 3341, Roberts 2010 Dep. 117:21-119:10, 141:13-144:2.

approval from the district manager.

**RESPONSE:** Defendants admit that Store Managers reports to District Managers, who in turn each oversee approximately 15 or more stores. Defendants disputes Plaintiff's assertion that "District Managers are responsible for operating the stores" to the extent that it implies District Managers have primary responsibility for running daily operations at each of their stores and Store Managers do not— Plaintiff cites not evidence that would reasonably support such an inference. For the purposes of this summary judgment motion only, Defendants do not dispute the remaining facts. The disputed and undisputed assertions in this paragraph are not material and are misleading to the extent that it is intended to imply that Store Managers were subject to close and direct supervision in their stores. Plaintiff Jennie Roberts admits that her District Manager visited her store infrequently, irregularly, and did not directly assign her to complete specific tasks herself.[12] There is no evidence that District Managers are referred to as part of a "store team."

**B.** **Plaintiff's "Individual" Additional Facts Pertinent to Jennie Roberts and Defendants' Responses**

1.    Roberts spent just 20 or 25 percent of her time performing managerial duties. (Roberts Dep. 182:18-183:6, 2010.) The remaining 75 or 80 percent of Roberts' time was spent "putting out stock and doing what needed to be done." (Roberts Dep. 183:8-9, 2010.) Roberts spent the majority of her time stocking the shelves. (Roberts Dep. 123:1416, 2010.) Roberts spent a lot of her time performing the same duties as other store employees, such as running the cash register and stocking the shelves. (Roberts Dep. 123:2-9, 2010.) Roberts performed duties such as cleaning the restroom and sweeping the sidewalk. (Roberts Dep. 94:16-95:10, 2005.) Roberts cleaned the bathrooms and swept and mopped the floors. (Roberts Dep. 179:2-4; 179:8-11, 2010.) When asked what she did in a typical day in the store, Roberts responded "[p]ut out stock, rearrange things, wait on customers, redo the stockroom." (Roberts Dep. 177:15-21, 2005.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not

---

[12] *See* Defendants' Statement of Facts ("SOF") ¶ 30.

dispute these facts; however, Plaintiff provided contradictory testimony in stating that she spent approximately 25 hours of her usual "58 to 60-something" hours per week performing managerial duties.[13] The facts as alleged here are not material.

      2.    As a store manager, Roberts would sometimes work 50 hours a week, sometimes 60 hours a week, and sometimes 80 hours a week, depending on the amount of payroll hours the store was given and whether inventory had to be done. (Roberts Dep. 29:15-21, 2010.) Roberts complained to the district manager on a number of occasions about her having to work 60 to 80 hours a week. (Roberts Dep. 170:6-12, 2010.) There were times when Roberts was the only employee to open and close the store. (Roberts Dep. 172:1-3, 2010.) Roberts went nearly five months without a key-carrying employee because the district manager would not allow an assistant store manager to be hired, which left Roberts in the store from open to close every day. (Roberts Dep. 56:4-10, 2005.) Store employees were not allowed to work overtime. (Roberts Dep. 56:19-23, 2005.) Roberts called the district manager and informed her that the store was becoming a mess and that the planogram was not getting done, but the district manager told her that she better get it done, not caring how long Roberts spent in the store. (Roberts Dep. 57:4-15, 2005.) Roberts was alone in the store running the cash register until 10:00 or 11:00 in the morning. (Roberts Dep. 63:21-64:1, 2005.) Roberts would sometimes arrive at the store at the same time as other employees, but would not leave until 12:00 or 1:00 the next morning. (Roberts Dep. 177:20-178:2, 2010.) Roberts would sometimes have to stay in the store after hours to recover the store, prepare for inventory, catch-up on the planogram, or finish the stocking from a truck delivery. (Roberts Dep. 144:20-145:1, 2010.) The only reason that Roberts left her employment at Dollar General is because she got tired of working so many hours. (Roberts Dep. 193:8-12, 2010.)

      **RESPONSE:** Defendants dispute Plaintiff's assertion that her work hours varied solely "depending on the amount of payroll hours the store was given and whether inventory had to be done." Although Plaintiff does testify that she "sometimes" worked 70-80 hours, she clarifies that these were

---

[13] *See* SOF ¶ 48; Roberts 2005 Dep. 189:14-23.

limited circumstances when she was without a key carrier on staff.[14] Defendants dispute that "store employees were not permitted to work overtime," as even Plaintiff admits that overtime could be authorized by a Store Manager.[15] For the purposes of this summary judgment motion only, Defendants do not dispute the remaining facts. The disputed and undisputed assertions as alleged here are not material facts, and are also misleading to the extent that they imply that Plaintiff was the only employee working in her store for a five-month period, a fact for which there is absolutely no supporting evidence.

   3. The store was given a labor budget for the scheduling of employees. (Roberts Dep. 97:18-20, 2010.) Roberts had no input over what the store's labor budget should be. (Roberts Dep. 170:2-5, 2010.) Roberts always worked "truck day," which was the busiest day in the store and the day when most of the store employees were scheduled to work. (Roberts Dep. 123:22-124:5, 2010.) There were typically five or six employees scheduled to work "truck day." (Roberts Dep. 115:20-116:1, 2005.) A lot of the payroll budget was used on truck day. (Roberts Dep. 163:15-164:5, 2010.) The store received one truck delivery of merchandise a week. (Roberts Dep. 96:8-10, 2010.) It took about two or three hours to unload the 900 to 1,300 cases of merchandise off the delivery truck. (Roberts Dep. 114:16-115:2, 2005.) Except for truck day, there was typically just two employees in the store at a time. (Roberts Dep. 111:13-15; 116:7-11, 2005.) Having a restrictive labor budget, most of which was spent on truck day, led to Roberts working the excessive amount of hours that she did. (Roberts Dep. 165:1-11, 2010.)

   **RESPONSE:** Defendants' dispute the vague and conclusory allegation that "restrictive budgets" led to Roberts working "excessive" amounts of hours. For the purposes of this summary judgment motion only, Defendants do not dispute the remaining facts. The disputed and undisputed facts as alleged here are not material.

   4. Roberts did not have the authority to promote any store employee. (Roberts Dep. 174:13-16, 2010.) The district manager had to approve the promotion of any store employee to the assistant store manager position. (Roberts Dep. 40:19-41:1, 2010.) While Roberts could recommend employees be

---

[14] Roberts 2005 Dep. 189:14-190:1.

[15] Roberts 2010 Dep. 172:15-19.

promoted, it was ultimately the district manager who determined whether promotion was appropriate. (Roberts Dep. 44:21-45:4, 2010.) Christy Anderson was an employee the district manager promoted to assistant store manager without asking Roberts for her input, and Roberts felt as though Anderson should not have been promoted. (Roberts Dep. 42:18-43:6, 2010.) Julie Ray was a store employee that the district manager promoted to the assistant store manager position. (Roberts Dep. 40:6-8, 2010.) Felix Alosi was an employee that the district manager interviewed and hired without any input from Roberts. (Roberts Dep. 42:1-10, 2010.) There was an occasion where Roberts recommended an employee for the assistant store manager position but the district manager ignored the recommendation and hired an outside employee to fill the position. (Roberts Dep. 45:5-14, 2010.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material, and are misleading to the extent that they imply that Plaintiff lacked the authority to hire or make promotion recommendations that were given particular weight, as Plaintiff testified that she was authorized to, and did, hire many clerks, several of whom Roberts successfully recommended for promotion to Assistant Store Manager.[16]

5.      The district manager was in charge of terminating store employees when necessary. (Roberts Dep. 60:3-10, 2010.) No store employee could be terminated without first contacting the district manager. (Roberts Dep. 173:12-13, 2010.) Roberts was not allowed to terminate any employee in the store. (Roberts Dep. 101:2-5, 2005.) There were two employees Roberts caught watching television at the store that she thought should be terminated, but the district manager told Roberts to do progressive counseling instead. (Roberts Dep. 104:11-21, 2005.) Store employees typically were allowed three or four write-ups before termination, but the district manager once told Roberts to skip over some write-ups and give an employee a final warning. (Roberts Dep. 105:20-106:8, 2005.) Roberts informed the district manager about an employee she suspected of stealing merchandise that Roberts felt should be terminated, but the district manager told her there was nothing she could do about it. (Roberts Dep. 102:6-21, 2005.)

[16] See SOF ¶ 39-41.

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material.

6.     A "planogram" dictates the layout of the store by describing where items should be placed in the store, what shelves the items should be placed on, and how many facings a particular product should have. (Roberts Dep. 129:22-130:4, 2010.) The store also received a "monthly planner" which dictated where merchandise should be placed in the store. (Roberts Dep. 130:5-10, 2010.) All employees were responsible for setting the planogram. (Roberts Dep. 129:16-18, 2010.) When the planogram did not fit the store exactly, either due to the store being too small or too large, Roberts called the district manager and he or she would come down to the store to check things out. (Roberts Dep. 130:14-131:1, 2010.) Any store employee could put merchandise in the store's "flex" space, except at Christmas time when Dollar General corporate headquarters dictated what items would be placed in the space. (Roberts Dep. 76:15-21, 2010.) Putting merchandise in the flex space was not an attempt by Roberts to increase the store's sales, but instead flex space was used as storage space for merchandise that would not fit on the shelves or in the backroom. (Roberts Dep. 91:12-17, 2005.) Extra merchandise that could not fit on the shelves was placed in the "flex" space, which was space not planogrammed. (Roberts Dep. 89:9-90:16, 2005.) The district manager would sometimes determine what merchandise should be placed in the store's flex space. (Roberts Dep. 90:18-91:4, 2005.) The district manager would sometimes come into the store and tell Roberts to rearrange the merchandise that was placed in the flex space. (Roberts Dep. 177:10-12, 2010.)

**RESPONSE:** Defendants object to Plaintiff's attempt to lump half a page of purported facts containing a multitude of contentions together in one paragraph. This is not in line with the requirements of Local Rule 56.01, and further, makes it impracticable to agree or refute the facts in paragraph. For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material.

7.     The ordering of merchandise was based on the difference between the amount of a particular product in stock and the amount of the product that Dollar General corporate headquarters

determined should be in stock. (Roberts Dep. 84:4-14, 2005.) Merchandise which was on the planogram was sent automatically to the store, without the need for Roberts or another store employee to order it. (Roberts Dep. 176:6-10, 2010.) Seasonal merchandise, such as Christmas and Easter products, were sent automatically to the store by Dollar General corporate headquarters. (Roberts Dep. 86:19-87:5, 2005.) Roberts, the assistant store manager, and the third key could all order merchandise for the store, and at one time the cashiers ordered store merchandise. (Roberts Dep. 82:15-83:3, 2005.) Roberts was not allowed to contract with any outside vendors for the store. (Roberts Dep. 177:13-16, 2010.) Vendors such as Pepsi and Frito-Lay would visit the store, count the amount of their particular product in the store, and then stock the shelves, meaning Roberts had no input over how much was stocked. (Roberts Dep. 176:11-22, 2010.) While Roberts was able to make special orders for customers upon request, if the requested amount to be ordered was high, then Roberts would have to get approval from the district manager. (Roberts Dep. 132:19-133:9, 2010.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material.

8. Roberts had to discuss an applicant for the store's assistant store manager position with the district manager prior to the applicant's hire, and the district manager sometimes interviewed the applicant before hiring. (Roberts Dep. 27:4-28:9, 2005.) The district manager reviewed applications, and some applications were sent to the store from other Dollar General stores and were selected because it was believed those particular applicants would make good employees. (Roberts Dep. 46:20-47:4, 2010.) The district manager would sometimes come into the store and review applications and interview applicants for the store's assistant store manager position without any input from Roberts. (Roberts Dep. 28:17-22, 2005.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material, and are misleading to the extent that they imply that Plaintiff lacked the authority to hire or make promotion recommendations that were given particular weight, as Plaintiff testified that she was authorized to, and did, interview and hire many clerks

without oversight or input from a District Manager, and several of those whom Roberts hired she also later successfully recommended for promotion to Assistant Store Manager.[17]

9.      The district manager was in contact with Roberts every day. (Roberts Dep. 181:19-21, 2010.) The store would receive voicemail messages every day. (Roberts Dep. 181:12-14, 2010.) The store received voicemail messages from the district manager informing the employees what needed to be done, when the district manager would be visiting, etc., and received store mail from Dollar General corporate headquarters which contained planners, notices, etc. (Roberts Dep. 79:8-17; 80:6-10, 2010.) The district managers would visit the store and tell Roberts what needed to be done and the amount of time it needed to be done by, and would sometimes come back to confirm the work was completed. (Roberts Dep. 86:13-87:5, 2010.) Most district managers stayed half a day or all day when they visited the store, depending on the situation. (Roberts Dep. 87:12-15, 2010.) Roberts was required to communicate with one district manager through voicemail when she completed a task such as planograms or markdowns. (Roberts Dep. 66:18-67:4, 2005.) Roberts would have to leave a voicemail message for another district manager when she completed a store report or when a task assigned by the store's weekly mail was complete. (Roberts Dep. 76:12-21, 2005.) The store received mail weekly from Dollar General corporate headquarters which informed Roberts what needed to be done, such as marking-up certain products. (Roberts Dep. 155:10-16, 2005.)

**RESPONSE:** Defendants object to Plaintiff's attempt to lump half a page of purported facts containing a multitude of contentions together in one paragraph. The facts as alleged here are not material, and are misleading to the extent that they imply that Plaintiff was closely and directly supervised by a DM, and to the extent that it implies that Roberts spoke with her DM every day. For the purposes of this summary judgment motion only, Defendants do not dispute these facts, except to clarify that Plaintiff's communication was not with DM "every day" as asserted, but was via voicemail, from the "District manager or corporate office letting us know, say, the computers are going to be down or

---

[17] See SOF ¶ 39-41.

something. It was information we needed to know."[18] Roberts admits that her District Manager visited her store infrequently, irregularly, and did not directly assign her to complete specific tasks herself.[19] It is undisputed that Roberts did not get telephone calls or District Managers voicemail directed solely at Plaintiff each day.[20]

10.  The Standard Operating Procedures manual sets out in detail how to perform various tasks in the store. (Roberts Dep. 118:18-21, 2010.) The Standard Operating Procedures Manual provides a reference for store employees to review if there is a problem in the store. (Roberts Dep. 163:4-7, 2005.) Roberts read the Standard Operating Procedures manual, and would refer back to it when she had questions. (Roberts Dep. 118:3-10, 2010.) Roberts at one time frequently reviewed the store's Standard Operating Procedures Manual, but later relied more heavily on her district manager, contacting him or her when problems arose in the store. (Roberts Dep. 163:8-23, 2005.)

**RESPONSE:**  For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material, and are also misleading to the extent that they seek to create an inference that Plaintiff no discretionary power to manage her store or that SOPs are instructed Plaintiff how to handle every situation that might arise in a store. Plaintiff testified that she could use her best judgment to deviate from the SOPs when necessary or appropriate, and that the SOPs were nothing more than a "tool" or "reference" material in her job performance.[21] The assertions are further misleading to the extent they seek to create an inference that Plaintiff lacked discretion to handle problems that arose in her store, such as disciplinary problems as and she admits exercising her discretion to determine whether policy violations merited an individual discussion or formal written discipline.[22]

11.  The only training Roberts received prior to becoming a store manager was on-the-job training she received while she was an assistant store manager. (Roberts Dep. 23:2-8, 2010.) Roberts did

---

[18] See 2010 Dep. 181:12-18.

[19] *See* Defendants' Statement of Facts ("SOF") ¶ 30.

[20] Roberts 2010 Dep. 84:1-5, 191:20-23.

[21] *See* Ex. 37, APP 3335, 3341, Roberts 2010 Dep. 117:21-119:10, 141:13-144:2.

[22] Ex. 36, APP 3269, Roberts 2005 Dep. 99:20-13; Ex. 37, APP 3319, Roberts 2010 Dep. 55:15-56:1, 56:8-22.

not hold any retail job prior to her employment with Dollar General. (Roberts Dep. 15:15-18, 2005.) Roberts had never held a management position prior to her becoming a Dollar General store manager. (Roberts Dep. 16:2-5, 2005.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material.

12.     Other than performing manual labor duties in store number 2016, Roberts also assisted in another Dollar General store for a month or so, where she unloaded the delivery truck and straightened and cleaned the store. (Roberts Dep. 26:5-12, 2010.) Roberts disagrees that she was the highest-ranking employee in the store because she did not consider herself high-ranking. (Roberts Dep. 26:17-27:2, 2010.) Roberts was sent to other Dollar General stores to help clean-up and rearrange merchandise, much like other Dollar General store managers. (Roberts Dep. 71:1-15, 2005.)

**RESPONSE:** For the purposes of this summary judgment motion only, Defendants do not dispute these facts. The facts as alleged here are not material.

13.     Dollar General corporate headquarters determined an employee's initial rate of pay. (Roberts Dep. 173:1-4, 2010.) Roberts was not allowed to determine employees' rates of pay, and did not make recommendations because she and others were lectured in a managers' meeting that employees were to make a certain amount, no more and no less. (Roberts Dep. 160:14-161:9, 2005.) Roberts did not have the authority to determine whether an employee received a pay raise. (Roberts Dep. 173:5-7, 2010.) Any overtime worked by store employees had to be approved by the district manager. (Roberts Dep. 172:15-19, 2010.) Roberts had no control over what employees were allowed to have keys to the store. (Roberts Dep. 175:12-15, 2010.) The district manager had to be informed and had to approve of any repairs to the store. (Roberts Dep. 134:14-21, 2005.) If the store's air condition unit went out, or some other problem such as that arose in the store, Roberts would contact the district manager and he would tell the store who needed to be called. (Roberts Dep. 140:22-141:6, 2010.) Dollar General corporate headquarters determined what temperature the store's thermostat should be set on. (Roberts Dep. 143:12-15, 2010.) While employees with problems or complaints may have visited Roberts first, they would

ultimately speak with the district manager if their problems were not solved. (Roberts Dep. 55:9-14, 2010.) If an employee violated policy, Roberts would discuss the situation with the district manager and the two of them would determine the proper course of action. (Roberts Dep. 56:2-7, 2010.) Roberts had to contact the district manager a month in advance and ask permission to take her vacation time that had accrued. (Roberts Dep. 181:11-182:11, 2005.) Roberts had to inform the district manager when "writing-up" an employee for a cash shortage, although the district manager would already know of the cash shortage because Dollar General corporate headquarters would notify him of such shortage. (Roberts Dep. 98:3-18, 2005.) There was a Dollar General policy that Roberts had to follow with respect to writing-up an employee who was a specific amount short after operating a cash register. (Roberts Dep. 97:20-98:2, 2005.) Roberts was told by her district manager that she had to write-up an assistant store manager who left the bank deposit in the store, and she was told to word it so that it said the assistant store manager was not protecting company assets. (Roberts Dep. 100:5-13, 2005.) Expenses, such as utility bills, went straight to Dollar General corporate headquarters. (Roberts Dep. 135:23-136:9, 2005.) Roberts was unaware of any expenses she was required to keep down. (Roberts Dep. 136:10-14, 2005.) At one time store cashiers were evaluated, and the district manager would review the evaluations and sign off on them. (Roberts Dep. 164:13-20, 2005.) Then only the assistant store manager was evaluated, and the district manager performed half of the evaluation and told Roberts that the assistant store manager's overall evaluation score should be lower than her own. (Roberts Dep. 164:20-165:7, 2005.) If there was a disagreement between Roberts and the assistant store manager concerning policy or any other issue, Roberts would have to leave the district manager a voicemail message and wait for him to call back. (Roberts Dep. 170:18-171:9, 2005.) Roberts' responsibilities and job duties stayed basically the same after being promoted from assistant store manager to store manager, she just had to work more hours. (Roberts Dep. 30:5-10, 2005.) When asked if she agreed that there were some duties she performed as a store manager that were not performed by the assistant store managers Roberts responded no, that they "all were responsible for the same thing." (Roberts Dep. 71:19-23, 2010.)

      **RESPONSE:** Defendants object to Plaintiff's attempt to lump nearly two pages of vague and

conclusory purported facts containing a multitude of contentions together in one paragraph. This is not in line with the requirements of Local Rule 56.01, and further, makes it impracticable to agree or refute the paragraph. However, as alleged (*i.e.*, "Roberts was unaware of any expenses she was required to keep down;" they "all were responsible for the same thing;" Roberts "had no control over what employees were allowed to have keys to the store") the facts here are not material, and are misleading to the extent that they contradict Roberts' clear testimony that <u>she</u> supervised and evaluated ASMs (not the other way around), she was in charge, the "leader," and was the highest-level employee in her store on a day-to-day basis; she also performed scheduling, progressive discipline and hiring functions that ASMs did not—so although she may have performed <u>some</u> similar duties, Roberts clearly concedes that she had greater responsibility above and beyond that of an ASM.[23] Roberts admits she was charged with ensuring the store's profitability, requiring her to remain vigilant in minimizing the risk of losses "every minute of every day;"[24] and she also had to prepare the stores schedule with operational needs and budgeting requirements in mind[25]—thus, she was well aware of expenses she needed to "keep down"— notwithstanding self-serving conclusions to the contrary. Roberts admits that she possessed virtually unfettered authority to select and hire clerks, several of whom Roberts successfully trained and recommended for promotion to Assistant Store Manager[26]—conclusively establishing that she exercised some "control" over who had keys to the store. For the purposes of this summary judgment motion only, Defendants do not dispute the remaining facts as being accurate reflections of Plaintiff's testimony, but none of these assertions—disputed or undisputed—are material facts.

---

[23] Ex. 37, APP 3312, Roberts 2010 Dep. 27:13-18.
[24] Ex. 37, APP 3331, Roberts 2010 Dep. 101:17-102:3.
[25] Ex. 37, APP 3324, Roberts 2010 Dep. 74:3-75:2.
[26] See SOF ¶ 39-41.

Respectfully submitted,


/s/ Melissa M. Hensley
Melissa M. Hensley
Texas State Bar No. 00792578
Ronald E. Manthey
TX Bar No. 12927400
(admitted pro hac vice)
Joel S. Allen
TX Bar No. 00795069
(admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX  75201-7347
Tel:      214-466-4000
Fax:      214-466-4001
melissa.hensley@morganlewis.com
ron.manthey@morganlewis.com
joel.allen@morganlewis.com


**ATTORNEYS FOR DEFENDANTS**



**CERTIFICATE OF SERVICE**

        This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record via the court's CM/ECF system on this 5th day of November 2010, as follows:

| | |
|---|---|
| Lance Gould | Trevor Wayne Howell |
| Roman Shaul | Gullett, Sanford, Robinson & Martin |
| Beasley, Allen, Cox, Methvin, | P.O. Box 198888 |
| Portis & Miles, P.C. | Nashville, TN 37219-8888 |
| 272 Commerce Street | thowell@gsrm.com |
| Montgomery, AL  36103-4160 | |
| lance.gould@beasleyallen.com | |
| roman.shaul@beasleyallen.com | |


                                    */s/ Melissa M. Hensley*
                                    Melissa M. Hensley