# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

JENNIE ROBERTS,           )
                                  )
                                  )
       **Plaintiff,**        )
                                  )
                                  )      **Case No. 2:09-0005**
                                  )      **Judge Trauger**
**v.**                               )
                                  )
**DOLGENCORP, INC. and**     )
**DOLGENCORP, LLC,**       )
                                  )
       **Defendants.**      )

## MEMORANDUM

Pending before the court is the defendants' (collectively referred to as "Dollar General")

Motion for Summary Judgment (Docket No. 30) to which the plaintiff has responded (Docket

Nos. 40 and 43), and the defendants have filed a reply in support (Docket No. 47).[1]  For the

reasons discussed herein, this motion will be granted, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

As of 2005, Dollar General operated approximately 7,500 stores in 30 states, with an

average sales volume exceeding $1 million per store.[2]   The stores sell basic consumer goods at

---

[1]This case is one of many factually similar Fair Labor Standards Act (FLSA) cases that were filed against Dollar General in the past several years and one of 21 that is currently pending before the court.  (*See* Docket No. 25.)   Consistent with this, Dollar General filed a "common" brief in support of its motion for summary judgment (Docket No. 31) and a brief specific to this plaintiff (Docket No. 34).  The plaintiff responded to these briefs by filing a "common" response and an individual response.

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 35, 42, and 46) and related affidavits and exhibits.  Although facts are drawn from

relatively low prices.  All Dollar General stores are operated according to a uniform Standard

Operating Procedures (SOP) manual distributed by Dollar General's corporate offices.  The SOP

provides for the basic distribution of labor in each of the stores and provides "step by step

instructions on how to perform job functions."  (Docket No. 46 at 9.)

That is, each store has a store manager, and the store manager directs an assistant store

manager (ASM), a lead clerk (or "third key") and several clerks.  Store managers report to a

district manager, who oversees 15 to 25 stores. The store manager receives directives from the

district manager and from higher corporate offices, in the form of "store mail."  The store

manager also receives a performance review from the district manager that evaluates the store

manager on sales volume, safety awareness, loss prevention (or "inventory shrink"), training and

development, controllable expenses, customer satisfaction, and merchandising.   To the extent

that ASMs receive evaluations, they are evaluated on similar criteria.

In 1995, Dollar General began a process of converting its store managers from hourly

employees (eligible for overtime pay) to "exempt" employees, to be paid a set salary no matter

the number of hours worked per week.  This was a lengthy process, but, now, all store managers

are paid a weekly salary and are eligible for a bonus, based on the store's profitability.  Store

managers are the only "in-store" employees paid on a non-hourly basis, and, as of 2006, the only

---

submissions made by both parties, on a motion for summary judgment, all inferences are drawn
in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th
Cir. 2000).  In responding to the defendants' statements of fact (many of which are
argumentative), the plaintiff would often not dispute the statement, but "object" to it (or the
implication thereof), and then recite one of its basic legal positions in this case.  (*See* Docket No.
42 at 8.)  The court has waded through this rhetoric and the voluminous filings and distilled the
undisputed facts.

in-store employees eligible for a bonus.  Before 2006, ASMs had been eligible for a bonus considerably smaller than the store manager's bonus.

The plaintiff, Jennie Roberts, worked at a Dollar General in Carthage, Tennessee (Store No. 2016), from 1993 to April 1, 2005.  She was hired as a part-time clerk, promoted to ASM, and then promoted to store manager in August 1996, a position that she held until she resigned in 2005.  Roberts received no formal training prior to becoming store manager.  Roberts received a salary from 2001 forward, receiving $420 per week in 2001, $460.72 in 2002, 469.93 in 2003, and 540.38 in 2004 and 2005.  Roberts was the highest paid employee in the store; the ASM received between $6.50 and $7.50 per hour.  Roberts also received a bonus each year of $7,071, $9,271, $1,500, $4,583, and $2,400, respectively.

Like most Dollar General stores, Roberts' store was ordinarily staffed with one ASM, four clerks and a third key.  Roberts had a "labor budget" provided to her by her district manager, which was generally between 140 and 180 hours per week, to be allocated among the employees of the store (not including Roberts).

Roberts had four district managers during her time as store manager, and these district managers generally oversaw between 16-18 stores.  While the district managers visited the store relatively infrequently (on average, less than once a month), Roberts maintains that they were a regular, often daily, presence through voicemail contact that contained instructions as to how to carry out the store's business.  Roberts was also expected to communicate with her district manager when she had completed key tasks.

The key issue in this case is the extent to which Roberts' role at the store was "managerial," such that she was properly classified as "exempt" under the FLSA.  The

defendants maintain that Roberts was the "leader" of the store, was "in charge" on a day-to-day basis, and was "directly accountable for the performance of her store" and for the enforcement of Dollar General's polices. (Docket No. 42 at 20.) Roberts claims that her "most important duties . . . were manual labor duties" and that she spent the "majority of her time performing manual labor duties." (*Id.* at 20-21.)

These issues were the primary subject of Roberts' two depositions, one of which was conducted in March 2005 (just before she left Dollar General), in conjunction with a related case against Dollar General, and one of which was conducted in March 2010, in conjunction with this case. In those depositions, Roberts confirmed that, while she did not consider herself "high ranking," she was "the leader" of the store and that the employees looked to her as the one "in charge," such that they would contact her, even when she was out of the office, with questions. (Docket No. 33 Ex. 3 at 27, 126.) Roberts confirmed that she was responsible for ensuring that the policies in the Dollar General handbook were enforced and for ensuring the basic profitability of the store, and that she was the one held accountable when the store did not perform up to expectations. (*Id.* at 51-52, 102.)

Roberts also had considerable, although not absolute, discretion in terms of staffing her store. That is, while key employees, such as ASMs, were hired by her district manager (Docket No. 33 Ex. 1 at 24), Roberts was solely responsible for hiring clerks, and she made recommendations to her district manager regarding employee promotions and potential ASMs, which were, usually, accepted. (Docket No. 33 Ex. 3 at 41-47; Docket No. 33 Ex. 1 at 25-26.) Also, while authority to terminate employees rested with the district manager, Roberts was responsible for issuing warnings to employees, and she made termination recommendations to

her district manager. (Docket No. 33 Ex. 3 at 57-60.) That is, if Roberts saw an employee acting inappropriately, she had discretion to determine what level of discipline the conduct merited. (*Id.*) That said, from time to time, Roberts' district manager would promote an employee or transfer an employee into Roberts' store without her input, and Roberts' recommendations as to who should be terminated were not followed on at least two occasions.

In terms of ensuring profitability, Roberts played a key role in reducing "shrinkage," or avoiding loss. (*Id.* at 102.) This included ensuring that vendors were honoring their delivery obligations, preventing shoplifting, ensuring that her employees were not stealing, and marking down damaged merchandise, rather than simply throwing it away. (*Id.* at 103, 143.) Roberts testified that she had discretion as to how much to mark down damaged merchandise and that she would spend "one day out of the week" doing "markdowns and damages." (*Id.*) Roberts also testified that she tracked known shoplifters in the area, including attending local court hearings. (Docket No. 33 Ex. 2 at 137-38.) Roberts also came to know store regulars who needed extra assistance, and she would train her employees to recognize these customers and cater to their unique needs. (Docket No. 33 Ex. 1 at 107-108.)

Roberts' other managerial duties included setting and adjusting the work schedule for the week, which generally took a "couple of hours," dealing with customer complaints, submitting payroll, and ordering limited merchandise, which, depending on the technology available, might take between 1-3 hours per week. (Docket No. 33 Ex. 3 at 71-81, 135.) Roberts also trained new employees, conducted monthly safety meetings, and approved employee vacation. (*Id.* at 167-168; Docket No. 33 Ex. 2 at 143, 153.)

Despite these responsibilities, Roberts maintains that she also lacked discretion and

managerial responsibility in key areas, and, as a result, her job resembled that of a clerk or the non-exempt ASM more than it did a salaried "executive." She testified that she did not determine the rate of pay for her employees, allocate overtime allowances, set the total labor budget for the week, or fire employees. (Docket No. 33 Ex. 3 at 173-176.) Additionally, because the vast majority of goods were delivered automatically based on a computer system's recognition of what goods had sold, Roberts had limited ordering responsibilities. She noted that the district manager or the corporate office: (1) controlled who performed maintenance on the store, (2) determined who delivered items to the store, (3) mandated the temperature settings of the store (although she could adjust them based on customer demand), (4) paid the bills of the store, and, (5) with very few exceptions, determined where individual items were placed on the individual shelves. (*Id.* at 177-178; Docket No. 33 Ex. 2 at 134-36.)

Indeed, store managers received a "planogram" from Dollar General's corporate offices that dictated exactly where in the store specific items were supposed to be placed. (Docket No. 33 Ex. 1 at 87-88.) The planogram did include "flex" space, which, potentially, afforded the store manager (or the district manager) some discretion in terms of how to use that space. (*Id.* at 89-92.) As indicated above, store managers have virtually no control over the specific merchandise that is sold in the store, and the vast majority of "purchasing" for the store is done by an automatic system that orders more of a good as it is sold. However, Roberts could place small orders for certain products that were specially requested by a customer.

It is also clear that much of the attention of the store was centered on "truck day," or the day of the week in which the delivery truck arrived. All employees participated in the difficult tasks associated with truck day. Stores generally received between 800 and 1200 boxes of

merchandise on truck day, to be unloaded and placed on the shelves according to the planogram, which, plainly, involved a considerable amount of physical labor on the part of all employees, including Roberts.

Roberts also testified that ASMs had the authority to do many of her tasks, such as setting the schedule, training the clerks, and the limited ordering of merchandise. (Docket No. 33 Ex. 3 at 71-81; Docket No. 33 Ex. 1 at 82-83.) Roberts did concede that she largely retained these responsibilities to ensure that the job was done correctly and that she "checked up" on her employees to ensure that they had correctly done the tasks that she had delegated. (*Id.*)

In light of this, Roberts testified that she ended up doing the "same stuff" as the other employees in the store and worked more hours to ensure that this relatively basic work was accomplished. (Docket No. 33 Ex. 1 at 30.) While Roberts testified that the conditions of the store deteriorated when she was not there, she claims that this was because she spent such a large amount of time performing basic, non-managerial, tasks to improve the appearance of the store. Indeed, Roberts spent a considerable portion of her time stocking the shelves, running the cash register, cleaning bathrooms, and mopping floors.

Roberts was also asked to estimate the amount of time that she spent on managerial duties. Three times during the 2010 deposition she said that she spent "about 25 hours a week, maybe" on the managerial tasks but later stated that she spent only between 20 and 25 percent of her time on managerial tasks. (Docket No. 33 Ex. 3 at 169-70, 183.) During her 2005 deposition, Roberts responded "Yes," to the question whether she spent "most of" her time "performing all those sorts of duties," which, generally, referred to the management type duties discussed above. (Docket No. 33 Ex. 2 at 161.) However, during the same deposition, the

plaintiff stated that, on a "typical" day, she would "put out stock, rearrange things, wait on customers, redo the stockroom." (*Id.* at 177.)

Roberts also stressed that she worked many hours per week. She testified that she was expected to work at least 45 hours per week and that she "always" worked more than 40 hours per week. (Docket No. 33 Ex. 3 at 32.) When she had a "third key," she maintained that she worked between 55 and 70 hours per week; during the time periods that she was understaffed, she maintained that she was there "open to close" and stated that there were times that she had been at work "all night." (Docket No. 33 Ex. 2 at 177.) Roberts maintains that, because her labor budget was often severely depleted by truck day and she could not pay overtime, she would, from time to time, work up to 80 hours per week, often performing tasks that were "supposed" to be done by clerks.

## ANALYSIS

The defendants maintain that the undisputed facts and law demonstrate that the plaintiff was an exempt employee and, therefore, not entitled to overtime pay under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* The plaintiff asserts that she is entitled to overtime pay because her job functions did not qualify her as an "exempt" employee and that the factual issues regarding the circumstances of her employment preclude summary judgment.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of

material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    Dollar General's Motion for Summary Judgment

### A.    Basic Law

The basic law is not disputed. The FLSA exempts employers from paying otherwise required overtime (time-and-one-half for each hour over 40 in a week) to employees who work in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 207(a)(1); 29 U.S.C. § 213 (a)(1). The Secretary of Labor is responsible for promulgating regulations that help define the scope of exemptions. *See id.* While FLSA overtime exemptions are affirmative defenses that are to be "narrowly construed," an "employer claiming an FLSA exemption does not bear any heightened evidentiary burden." *Thomas v. Speedway SuperAmerica, LLC*, 506

F.3d 496, 501-02 (6th Cir. 2007).

Because Roberts worked at Dollar General both before and after August 23, 2004, two sets of regulations are at issue in this case – the "old regulations," which pre-date August 23, 2004, and the "new regulations," which were enacted, prospectively, on that date. *See Baden-Winterwood v. Life Time Fitness*, 566 F.3d 618, 629 (6th Cir. 2009). Under the old regulations, where, as here, the plaintiff earned more than $250 per week, the plaintiff's status is evaluated under the "short test," which considers: (1) if her "primary duty consists of management of the enterprise" and (2) if her primary duty "includes the customary and regular direction of the work of two or more other employees." *Speedway*, 506 F.3d at 502 (quoting 29 C.F.R. § 541.119(a) (2003); 29 C.F.R. § 541(f) (2003)).

To qualify as an executive under the "new" regulations, the plaintiff must (1) be paid more than $455 per week, (2) have "management of the enterprise" as her "primary duty," (3) regularly direct two or more employees, and (4) have "authority to hire or fire other employees" or to make "suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees [that] are given particular weight." *Id.* (quoting 29 C.F.R. § 541.100(a)).

Despite the two sets of regulations, the determinative issue here is whether Roberts' "primary duty" was management of the enterprise, that is, her Dollar General store. There is no dispute that she met the salary threshold of the regulation in place at the time, that she consistently directed two or more employees, and that she had authority to hire employees, along with the authority to make personnel recommendations and suggestions. The court, therefore, turns its attention to the primary duty issue.

### B.     Primary Duty Standard

The term "primary duty" means "the principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  The regulations provide several factors to consider in determining whether an employee's "primary duty" is management.[3]  In addition to time spent managing, the old regulations set forth four non-exclusive factors to consider: (1) the relative importance of the managerial duties as compared with other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) the employee's "relative freedom" from supervision; and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the plaintiff. *Speedway*, 506 F.3d at 504-509 (citing 29 C.F.R. § 541.103 (2003)).  In addition to time spent managing, the new regulations similarly focus on "(1) the relative importance of the exempt duties as compared with other types of duties . . .  (2) the employee's relative freedom from direct supervision; and (3) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700(a)-(b).

That is, while the "discretionary powers" element of the old regulations has been rolled

---

[3]The definition of "management" is common sense and includes "interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property."  *Speedway*, 506 F.3d at 504 (quoting 29 C.F.R. § 541.102(b)(2003)).

into the elements stated in the new regulations, the focus remains consistent through the

regulations – courts are to explore the "totality of the circumstances" of the plaintiff's

employment and the "character of the employee's job as a whole" to determine whether the

employee's "primary" duty was management. *Id; Speedway*, 506 F.3d at 505. Additionally, the

amount of time spent in the performance of managerial duties may be a "useful guide" in the

analysis, and "employees who spend more than 50 percent of their time performing exempt work

will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). That said, "time

alone" is not the "sole test," and employees "who do not spend more than 50 percent of their

time performing exempt duties may nonetheless meet the primary duty requirement if the other

factors support such a conclusion." *Id.*

### C.      Primary Duty Analysis[4]

#### I.      *Speedway*

---

[4]As noted above, FLSA cases brought by Dollar General store managers have been working their way through the courts for several years, and it is clear from the parties' briefing that there is not a consensus of judicial opinion on whether, as a matter of law, a Dollar General store manager in Roberts' position should be considered exempt. For instance, in *Myrick v. Dolgencorp, LLC*, 2010 WL 146874 (M.D. Ga. Jan. 11, 2010), the district court concluded that Dollar General had not shown that the plaintiff's "principal value" to Dollar General was as a manager, precluding summary judgment for Dollar General. *Id.* at *5-7. Meanwhile, in *Johnson v. DG Retail*, 2010 WL 1929620, *3-7 (D. Utah May 13, 2010), the district court found that, even though the plaintiff spent only 20-30 percent of her time on "managerial tasks," she "ran the store on a daily basis without supervision, she used her discretion on a daily basis to reprimand and/or train employees as she saw fit, and she made the weekly schedule," and, therefore, she qualified as an exempt employee as a matter of law. These cases are just two examples of a split of judicial opinion on whether employees like Roberts qualify as exempt. *See also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1270 (11th Cir. 2008)(finding that manual tasks such as those required by "truck day" were "essential" to the operation of the store and affirming jury verdict in favor of the plaintiff); *Mayne-Harrison v. Dolgencorp*, 2010 WL 3717604, *24 (N.D. W. Va. Sept. 17, 2010)(granting summary judgment for Dollar General in light of the plaintiff's managerial responsibilities). That said, the court views this matter as squarely controlled by the Sixth Circuit's ruling in *Speedway*, as discussed below.

*Speedway*, which appears to be the Sixth Circuit's most recent statement on these issues, is a remarkably similar FLSA/executive exemption case that provides substantial guidance to the court. The plaintiff in *Speedway* was the manager of a gas station convenience store and was, as here, directly overseen by a district manager. 506 F.3d at 499. The plaintiff's district manager generally visited the store once or twice per week. *Id.* In addition to this "stringent managerial oversight," the defendant employer had "also adopted detailed company policies and standardized operating procedures, as an additional means of fostering consistency throughout its multi-store organization." *Id.*

As here, the plaintiff in *Speedway* was the most senior employee in the store and "ultimately in charge." *Id.* The plaintiff was expected to work at least 50 hours per week, "often worked much more than that," and was always on call. *Id.* The defendant classified the plaintiff as "exempt" and paid her a $522 per week salary plus additional compensation under a store profitability bonus program. *Id.* The plaintiff testified that she spent "approximately sixty percent" of her time performing "non-managerial tasks, such as stocking merchandise, sweeping floors, cleaning bathrooms, operating the register, and performing routine clerical duties." *Id.* However, she also had a clearly defined management role: "she supervised, interviewed, hired, trained, and disciplined employees; she prepared weekly work schedules for her employees; she resolved employee complaints; she monitored her employees' performance with formal evaluations; she recommended salary or merit increases for her employees (most of which were accepted by her district manager)." *Id.* Also, while she did not have the authority to terminate employees, she frequently recommended terminations to her district manager. *Id.*

After recognizing that the plaintiff did not spend more than 50 percent of her time

performing management work, the court considered the primary duty factors (technically, under the old regulations) and found that all favored a finding, as a matter of law, that the plaintiff's primary duty was management. *Id.* at 505. On the first factor, "relative importance," the court found that the plaintiff's managerial duties "were much more important" to the defendant's success than her non-managerial duties. *Id.* That is, if the plaintiff did not perform her non-managerial duties, the store would "still function, albeit much less effectively." *Id.* If she failed at her management tasks, however, the store "would not function at all," because there would be no employees, let alone a schedule by which they were supposed to work.

On the "discretionary powers" factor, the court recognized the plaintiff's argument that the district manager was a regular presence in the store and a potentially daily presence via telephone and e-mail. *Id.* at 506. However, this factor still favored a finding of management as the plaintiff's primary duty because, "even though [the plaintiff's] discretion was somewhat circumscribed by her district manager's supervision and Speedway's standard operating procedures, she *daily* exercised discretion over matters vital to the success of her station," such as staffing and delegating. *Id.* at 506-07 (emphasis in original).

On the "relative freedom from supervision" factor, the court found that the plaintiff, as the "most senior employee at her station . . . generally operated without a supervisor looking over her shoulder, monitoring her every move." *Id.* at 507. Even though the district manager may have "visited . . . once or twice a week, communicated with [the plaintiff] frequently via phone and email, and remained constantly available," the plaintiff was still "relatively free" from supervision. *Id.* at 507. Distinguishing from "direct, over-the-shoulder oversight," the court found that "a district manager's periodic visits, as often as a few days each week," along with

regular phone calls and e-mails, "do not negate a finding that the store manager operates free from supervision when the district manager is absent." *Id.* at 507-08.

On the final factor – salary – the court compared the plaintiff's salary with an hourly worker by dividing her weekly salary by the "assumed" 50 hours per week that she worked. *Id.* at 508. The court recognized that the plaintiff often worked more than 50 hours per week but noted that the plaintiff also received a bonus that would "significantly increase her hourly earnings." *Id.* at 509. Dividing the plaintiff's weekly salary by 50 hours per week resulted in an hourly wage about 30 percent higher than that of undefined "subordinate employees." *Id.* The court found that this salary disparity further supported the defendant's "primary duty" argument. *Id.* Overall, the court held that the defendant had "produced abundant evidence indicating" that the plaintiff's "primary duty was management," and, therefore, summary judgment for the defendant was appropriate. *Id.* With this Sixth Circuit authority in place, the court turns to the primary duty analysis in this case.

### ii. Time spent on management activities

As noted above, the plaintiff said different things when asked how much time she spent on management activities. Three times she stated that she spent 25 hours per week on management activities; another time she said she spent "most" of her time on those activities; but she also stated that she only spent 20 to 25 percent of her time on those activities. Either way, the plaintiff here emphasizes that she performed "substantial non-exempt work," such as unloading the truck, stocking the shelves, and running the cash register. (Docket No. 40 at 2.)

While the defendant does not argue that the plaintiff spent a majority of her time on management work (which would, if accurate, create the presumption of management as primary

duty), it is clear that the plaintiff spent a considerable amount of time (25 hours per week or 20 to 25 percent of the week) performing managerial tasks, and, moreover, while the plaintiff was performing non-managerial tasks, she was, by necessity, also supervising her employees and ensuring that they were following protocol. (Docket No. 33 Ex. 3 at 125)(plaintiff agreeing that "pretty much any time you're in the store, you're managing it.") In light of this, determining the precise number of hours per week that the plaintiff "managed" is difficult. *Speedway* does not make this issue a particularly weighty one in the calculus, and, moreover, given Roberts' estimates, she falls roughly in the same range as the plaintiff in *Speedway* – a majority of time spent on non-managerial activities, but a significant, non-negligible, amount of time spent actually managing. Therefore, this consideration certainly does not preclude a finding against the defendant on summary judgment.[5]

### iii. Importance of the managerial role

In light of the facts of this case and the clear language of *Speedway*, the court must conclude that the plaintiff's managerial role was "much more important" than her non-managerial role. As in *Speedway*, if the plaintiff did not stock shelves, run the register and clean the floors, the performance of the store would certainly be adversely affected; however, if she did not hire clerks, manage employee intake, make a work schedule, assign tasks, train

---

[5]The plaintiff also stresses that "Dollar General's low price business model" required that a manager spend a significant amount of time performing manual labor (non-managerial tasks), because the work had to get done and the restrictive labor budget precluded the plaintiff from assigning significant work to hourly employees. (Docket No. 40 at 9.) The plaintiff in *Speedway* also put in well over 40 hours per week, under a model that also relied upon a significant amount of non-managerial work being performed by a salaried manager. The court still found, however, that, above all else, the plaintiff was the manager of the store and ultimately responsible for its well-being, and this, as a matter of law, dictated that the plaintiff's primary duty was management.

employees, and supervise her staff, the store would cease to function at all. *See also Taylor v. True N. Mgmt.*, 2009 WL 2243648, *11 (S.D. Ohio July 24, 2009)("Managing the store was Plaintiff's most important responsibility, and clearly his primary duty. . . . if he had not hired and scheduled employees, obtained more inventory, reported payroll, and prepared sales reports, no one would have [done so]. . . . the fact that these duties took up no more than 25 percent of plaintiff's actual working time does not diminish their importance, and does not diminish plaintiff's management role.") Therefore, this factor strongly favors the defendant.[6]

### iv.     Exercise of discretion

As noted above, this factor is no longer explicitly listed in the regulations, but, clearly, issues of manager authority and control remain centrally relevant to the issue of whether the plaintiff's "primary duty" was management. *See Burson v. Viking Forge Corp.*, 661 F. Supp.2d 794, 802 (N.D. Ohio 2009). Plainly, Roberts, as the most senior employee in the store, performed the same "managerial" functions on a daily basis (training, supervising, hiring, planning) that the plaintiff in *Speedway* did, and the court, in that instance, found that the degree

---

[6]The plaintiff's primary point throughout her brief is that "the primary duty inquiry should be left for a jury due to its fact-intensive nature." (Docket No. 40 at 1.) The persuasiveness of the plaintiff's argument is undermined by the fact that she does not rely on (or cite) *Speedway*. Indeed, in her extensive reliance on non-controlling authority, the plaintiff all but ignores that the court is bound to apply the controlling case law of the circuit. The plaintiff includes ten pages of discussion of the supposed factual uncertainties that preclude a finding that the plaintiff's managerial role was "more important" than the non-managerial role. (Docket No. 40 at 12–20; Docket No. 43 at 5-7..) *Speedway* clearly dictates, however, that, because of the nature of the businesses at issue, managing and providing for the store's functioning is, by necessity, going to be "much more important" than stocking shelves and mopping bathrooms, even if that work constitutes the significant majority of the plaintiff's time. This is because the store will fail without the management tasks, whereas the store will only deteriorate without performance of the non-managerial tasks. The Sixth Circuit's pragmatic approach to this issue is consistent with its understanding that, if there is general agreement on certain broad issues (tasks performed, oversight, etc.), summary judgment is appropriate in this type of case.

of discretion exercised by the plaintiff strongly favored the defendant in the primary duty analysis.

As indicated above, the plaintiff focuses on the areas in which she lacked discretion, and there is no question that she did not have discretion in many "managerial" areas, such as merchandise, labor budget, pay rates, and the outlay of the store. (Docket No. 40 at 21; Docket No. 43 at 7-8.) Again, however, the Sixth Circuit in *Speedway* was clear: "stringent" oversight and "detailed company policies and standardized operating procedures" are not fatal to the employer's primary duty argument. The key issue is whether, on a day-to-day basis, the plaintiff had discretion to "run" the store, and, here, clearly, the plaintiff had that discretion. The plaintiff had to set the schedule for the week, delegate and assign tasks, counsel and advise employees of performance issues, among other "managerial" tasks. As noted above, she also had discretion to mark down merchandise, pursue shoplifters outside of the store, cater to frequent customers with special needs, and employ the "flex" area as she saw fit.

Additionally, while there was a lot of managerial work "done for" the plaintiff through the SOP and corporate hierachy of Dollar General, one oft-cited case found that the "very essence of supervisory work" is ensuring that these standardized procedures are followed. *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982). That is, not only was it the plaintiff's responsibility to ensure that the store was staffed and work was assigned, but it was her responsibility to ensure that the planogram was followed, merchandise arrived on time and in the quantities requested, and so forth. In light of all of this, the court finds that the plaintiff had

sufficient discretion for this factor to favor the defendant in the primary duty analysis.[7]

### v.    Relative freedom from supervision

In comparison to the district manager in *Speedway*, the plaintiff's district manager was a relatively rare in-store presence.  While the plaintiff testified that she frequently heard from her district manager by voicemail, there is no question that the district manager was rarely in the store and rarely corrected the plaintiff's work.  There is nothing here resembling the type of "direct, over-the-shoulder oversight" discussed in *Speedway*.  Rather, more than the plaintiff in that case, the plaintiff here was free to work, on a daily basis, without concern for her district manager looking over her shoulder, micro-managing her work.

The plaintiff argues that "every significant decision" she made was supervised in that, "while district managers may not visit . . . daily, the policies they create and implement are present daily."  (Docket No. 40 at 24.)  The plaintiff then rehashes her argument that, in matters of employee termination, payroll, ASM hiring, wages, and product placement, the store manager has reduced or no authority.  (*Id.* at 25.; Docket No. 43 at 10.)

Despite this, as in *Speedway*, this factor favors Dollar General.  To avoid summary judgment in light of that decision, the plaintiff must come forward with more than evidence that she had a district manager or that she worked under a corporate hierarchy that made key

---

[7]The plaintiff focuses on a 2004 survey of Dollar General stores in Oklahoma and Texas and provides a series of statistics related to time management at those stores.  (Docket No. 46 at 4-6; Docket No. 40 at 9; Docket No. 47 at 10.)  The court's focus is on the facts of this case, and, given that there is about 400 pages of deposition testimony from the plaintiff on the conditions in her store, this survey information is not particularly helpful.  The defendants filed a Motion to Strike this survey evidence and other materials (articles about Dollar General, etc.) from the summary judgment record.  (Docket No. 45.)  As the court would find for Dollar General with or without this evidence, the Motion to Strike will be denied as moot.  Also, because the court finds for the defendants, it is not necessary to address the parties' "liquidated damages" arguments.

decisions as to how her store was run and held her accountable for enforcement of those decisions. Rather, she needs to show that there was considerable, direct supervision over her work on a day-to-day basis. That is, that she had a district manager peering over her shoulder and evaluating the decisions she made. Here, the district manager (who had more than a dozen other stores to manage) was a rare presence in the store, and there is no question that, on a day-to-day basis, the plaintiff ran the store and directed her employees (most of whom she hired), consistent with the policies and procedures of her employer. The plaintiff's continued reliance on her lack of discretion in certain discrete areas is therefore misplaced.[8]

### vi. Salary

The method endorsed in *Speedway* for evaluating this issue is to take the plaintiff's weekly salary (not including bonus), divide it by the number of hours that the plaintiff worked per week, and compare that number to the "hourly wage paid to subordinate employees." 506 F.3d at 509. While estimating weekly hours worked is not an exact science, the *Speedway* court indicated that the court should estimate weekly hours on the low end, to compensate for the fact that the plaintiff was eligible for a bonus. *Id.* As noted above, the plaintiff estimated that she worked between 45 and 80 hours per week and that she was paid $420 per week in 2001, $460.72 in 2002, 469.93 in 2003, and 540.38 in 2004 and 2005, along with an average bonus of

---

[8]The plaintiff also repeatedly claims that store managers and non-exempt ASMs had similar jobs because, at first, "Dollar General used the exact same performance evaluation [forms] for both store managers and ASMs" and later used nearly identical performance criteria for evaluating store managers and ASMs. (Docket No. 40 at 16-17.) Again, not to belabor the point, but the *Speedway* court focused on what the plaintiff actually did in the workplace – not on more inferential issues like this one. Here, the plaintiff testified that, while she could have delegated some of her tasks to ASMs, she, for the most part, elected not to, and, when she did, she checked the work of the ASM, as she was ultimately accountable for the store's performance.

about $5,000 per year. Under *Speedway*'s guidance, an estimate of 50 hours per week is fair, and, under this calculation, the plaintiff would have made $8.40 per hour in 2001, $9.21 in 2002, $9.39 in 2003, and $10.80 in 2004 and 2005. The defendants point out that a non-salaried ASM (the next highest paid employee) made $6.70 in 2001, $7.00 in 2002, 7.50 in 2003, and $7.00 in 2004 and 2005. (Docket No. 34 at 15.) The plaintiff's "hourly" salary was between 20 and 36 percent higher than the next highest paid non-salary employee, not to mention other "subordinate employees." Under *Speedway*, this calculus supports the defendant's primary duty argument.

## CONCLUSION

Guided by *Speedway*, it is clear that, as a matter of law, the plaintiff's primary duty was management. Therefore, she qualified as "exempt" and was not entitled to overtime pay. Dollar General's Motion for Summary Judgment will be granted, and this case will be dismissed.[9]

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[9]An Order entered by Magistrate Judge Knowles in the lead case dictates that deadlines in the related cases are to be reset to be "90 days following" this ruling. (Case No. 3:09-0042, Docket Nos. 38, 41.) Accompanying this memorandum, the court will enter a new Order staying these cases pending a notice from the parties, within 28 days of this ruling, indicating how, with a strong focus on judicial economy, they wish to proceed. If the plaintiff wishes to appeal this ruling, judicial economy dictates that the other cases will remain stayed pending appeal.